## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KABONI SAVAGE**

Register #58232-066
USP Florence ADMAX
5880 CO-67
Florence, CO 81226

        *Plaintiff,*

    v.

**UNITED STATES DEPARTMENT OF JUSTICE**

**MERRICK B. GARLAND**, *in his official capacity as the Attorney General of the United States*

950 Pennsylvania Ave NW
Washington, DC 20530

**J. ROBERT BRYDEN II**, *in his official capacity as the Director, Office of Enforcement Operations*

**JENNIFER A.H. HODGE**, *in her official capacity as Deputy Assistant Attorney General*

1301 New York Avenue NW
Washington, DC 20530

        *Defendants.*

CIVIL ACTION NO: _____

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff Kaboni Savage files this Complaint to challenge his unlawful and unconstitutional treatment by officials of the United States Department of Justice ("DOJ") in Washington, D.C., and alleges as follows:

## INTRODUCTION

1.      For 14 years, Defendants DOJ, the Attorney General, and his subordinates have completely forbidden Mr. Savage, a federal prisoner, from having any communication with numerous family members and longtime, close friends.  Since at least 2015, without articulating any reason and without any meaningful process, Defendants have denied numerous requests from Mr. Savage to engage in such communications.

2.      In 2007, Defendants placed Mr. Savage under "Special Administrative Measures" ("SAMs") and have renewed them annually ever since, most recently in January 2021.  SAMs are an extraordinary form of communications restrictions imposed on just a few dozen federal prisoners, mostly terrorists or spies.  *See* 28 C.F.R. § 501.3.  Defendants initially imposed SAMs on Mr. Savage because of several homicides he was ultimately convicted of soliciting from the federal jail in Philadelphia in the early 2000s.  *See United States v. Savage*, 970 F.3d 217 (3d Cir. 2020).  The SAMs imposed on Mr. Savage dramatically curtail his contact with the outside world. They permit him to communicate with only seven preapproved individuals outside of his legal team.[1]  Further, Mr. Savage's SAMs status limits him to no more than two to four 15-minute telephone calls a month and minimal correspondence.  The SAMs also require that officials contemporaneously monitor and record those calls and any visits, and pre-screen and censor his mail.

---

[1]      Mr. Savage was recently informed that his request to add an Imam (a Muslim religious minister) from Denver, Colorado to his contact list had been approved.

3.      For almost a decade, the list of Mr. Savage's approved social contacts has remained at just seven people:  Mr. Savage's older sister, her two children, his own three children, and the mother of one of his three children.[2]  Over the years, Mr. Savage has repeatedly asked to expand the list to include additional family members and lifelong friends, but Defendants have denied Mr. Savage's requests at every turn.  Defendants' repeated denials have been wholly conclusory, issued without explanation and thus without any apparent assessment of the appropriateness of the requests.

4.      As a result of Defendants' actions, Mr. Savage is not allowed to communicate, in any way, with the mothers of two of his three children, his grandchildren, his daughter-in-law, other nieces and nephews, and extended relatives and close friends he has known for years.  These requested contacts have nothing in their backgrounds that justifies denying Mr. Savage contact with them, and there is no evidence that Mr. Savage's relationships with them would create a risk of violence or bodily harm.  Moreover, adding these individuals to Mr. Savage's contact list would not increase the total number of his allotted monthly letters, calls, or visits.  Thus, the relief sought would not lead to a greater burden on the resources of the DOJ or any other governmental entity.

5.      Defendants' repeated, unexplained, perfunctory rejection of Mr. Savage's annual requests to add individuals to his list of approved SAMs contacts over the past decade violate Mr. Savage's rights under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA") and the First Amendment to the United States Constitution.  Defendants' actions violate the APA because they violate DOJ's own regulations and are, therefore, "arbitrary, capricious, an abuse of discretion, and not in accordance with law."  Defendants' actions also deprive Mr. Savage of his

_____

[2]      The SAMs applicable to Mr. Savage allow him to also have contact related to his legal proceedings with his attorneys and other pre-approved members of his legal team.

3

First Amendment rights to free speech, free association, and familial association.  Mr. Savage requests that this Court declare Defendants' actions unlawful and enter an injunction requiring Defendants to grant Mr. Savage's requests to expand his SAMs contact list to include the individuals listed in Section C below, or in the alternative, require that Defendants revisit Mr. Savage's request to expand his contact list and apply the proper legal standard in evaluating that request.

## PARTIES

6.      Plaintiff Kaboni Savage is in the custody of the United States Bureau of Prisons ("BOP"), confined at the Administrative Maximum Facility in Florence, Colorado ("ADX Florence").  He is currently appealing a sentence of death imposed on him in federal district court in the Eastern District of Pennsylvania.

7.      Defendant DOJ is an agency of the United States government.  DOJ is responsible for imposing, renewing, and modifying Mr. Savage's SAMs, including the challenged limitation on contacts approved under those SAMs.

8.      Defendant Merrick B. Garland is the Attorney General of the United States.  Under 28 C.F.R. § 501.3, he has decision-making authority over the imposition, modification, and renewal of SAMs, including limitations on contacts for persons incarcerated in BOP facilities, such as Mr. Savage.  Mr. Garland is sued in his official capacity.

9.      Defendant J. Robert Bryden II is the Director for DOJ's Office of Enforcement Operations ("OEO").  As Director of OEO, Mr. Bryden has authority over whether to recommend to the Attorney General the imposition, modification, or renewal of the SAMs imposed on Mr. Savage.  Mr. Bryden is sued in his official capacity.

10.      Defendant Jennifer A.H. Hodge is a Deputy Assistant Attorney General at DOJ.  Ms. Hodge is the signatory of Mr. Savage's SAMs and thus has exercised decision-making

authority, delegated by the Attorney General, regarding the imposition, modification, or renewal of those SAMs, including the limitations on Mr. Savage's contacts. Ms. Hodge is sued in her official capacity.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction for claims seeking declaratory and injunctive relief under the APA and the First Amendment to the Constitution pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2). All or most of the ongoing acts, decisions, events, and omissions giving rise to Mr. Savage's claims have occurred and continue to occur in the District of Columbia.  The decisions to limit Mr. Savage's contacts, including the repeated refusals to modify his SAMs to allow additional contacts, have been made by DOJ officials in the District of Columbia.

13.     More specifically, much like the original procedure for imposing SAMs on Mr. Savage, the annual procedure for renewing Mr. Savage's SAMs, including his narrowed contact list, involves the following series of decisions by DOJ officials in the District of Columbia. First, based on a request and information received from local federal law enforcement officials in Philadelphia, OEO in the District of Columbia evaluates the propriety of renewing Mr. Savage's SAMs and prepares a "decision memorandum" for submission to the Attorney General or a designee.  Next, the Attorney General or a designee in DOJ, also in the District of Columbia, approves the memorandum and renews the SAMs.  Thereafter, OEO prepares a memorandum setting forth the specific measures the BOP is directed to enforce against Mr. Savage under the SAMs.  Each of these actions and decisions concerning the imposition, modification, and renewal of SAMs occurs at DOJ offices in the District of Columbia.

## ADMINISTRATIVE EXHAUSTION

14.     The Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e ("PLRA") requires that an incarcerated person exhaust "such administrative remedies as are available" prior to bringing a lawsuit to challenge prison conditions.  42 U.S.C. § 1997e(a).

15.     Mr. Savage has fulfilled the PLRA's requirements by exhausting the remedies available to him.

16.     Mr. Savage has annually applied to DOJ for the modification of his SAMs to include additional individuals on his contact list by filing a letter with DOJ in advance of the agency renewing his SAMs.  In submitting these annual requests, Mr. Savage's counsel in his capital case has sent a letter to the office of the United States Attorney for the Eastern District of Pennsylvania, who then forwards that request to the OEO and other Justice Department officials. Every year that Mr. Savage has submitted such a request, DOJ officials in the District of Columbia have authored, signed, and issued denials, which maintain the existing limitations on Mr. Savage's communications without explanation.  These denials are final and conclusive.  As representatives of DOJ and the BOP have acknowledged in communications relating to his capital case, DOJ is the exclusive decision-making authority regarding Mr. Savage's SAMs.  Thus, by submitting requests to DOJ to modify the communications restrictions in his SAMS, and by receiving repeated denials, Mr. Savage has exhausted his administrative remedies.

17.     Mr. Savage does not have access to administrative remedies other than directing SAMs modification requests to Defendants at DOJ.  The process described in paragraphs 13 and 16 above, in other words, is the only administrative process available to Mr. Savage for obtaining relief from the communications restrictions in his SAMs.

18.     The SAMs regulation, 28 C.F.R. § 501.3(e), does not furnish an administrative remedy to Mr. Savage. The regulation provides that an incarcerated person may request review of

SAMs through the BOP's administrative remedy program, which in turn directs the person to submit a grievance to the BOP, 28 C.F.R. §§ 542.13-542.15.  However, in practice and under the SAMs regulation itself, the BOP exercises no authority to impose, modify, or terminate Mr. Savage's SAMs.  Rather, as explained above, Defendant DOJ and its employees, Mr. Garland, Mr. Bryden, and Ms. Hodge, exercise the sole authority to make such decisions.  Thus, the BOP's administrative remedy process is not "capable of use" or "accessible" to Mr. Savage as a source of any "possibility of some relief" from the limitations on his contacts, and Mr. Savage is not required to request relief through this process to exhaust his administrative remedies prior to bringing this complaint.  *Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016).

## FACTUAL BACKGROUND

### A.    Mr. Savage's SAMs and the Limitations on His Contacts

19.    Mr. Savage has been in federal custody since 2004.  That year, he was charged in the Eastern District of Pennsylvania with drug trafficking and related crimes and was held in the Federal Detention Center ("FDC") in Philadelphia prior to trial.  The following year, he was convicted and sentenced to 30 years imprisonment.  After his conviction, Mr. Savage was imprisoned at the United States Penitentiary ("USP") in Atlanta, Georgia.

20.    While Mr. Savage was awaiting trial in 2004, six family members of a cooperating witness perished in a house fire caused by arson.  Two and a half years later, in 2007, based on the government's determination that Mr. Savage had solicited the arson via telephone calls placed from the FDC in Philadelphia, the Attorney General placed Mr. Savage under SAMs.  The BOP then transferred Mr. Savage from USP Atlanta to ADX Florence, the BOP's super-maximum-security prison.

21.    In 2009, Mr. Savage was indicted for murder in aid of racketeering and other offenses in the arson deaths of the cooperator's family, and for six other homicides between 1998

and 2004, including one he allegedly solicited from a local detention facility in Pennsylvania.  The government obtained authorization to seek the death penalty against Mr. Savage.  Before and during his capital trial, Mr. Savage remained under SAMs while detained in federal facilities in New York and Philadelphia.  In 2013, after Mr. Savage was convicted and sentenced to death, he was returned to ADX Florence.  He has been incarcerated there since.  As long as his SAMs are in place, he will remain there.

22.     Because Mr. Savage is subject to SAMs, he is incarcerated in the "Special Security Unit" or "H-Unit" at ADX Florence.  There are currently more than 154,000 persons in federal custody, approximately 40 to 50 of which are subject to SAMs.  Nearly all of the prisoners under SAMs are incarcerated in H-Unit at ADX Florence.

23.     Mr. Savage is kept in solitary confinement and has little opportunity to communicate with other incarcerated persons or staff inside ADX Florence.  Like others incarcerated in H-Unit, he spends from 22–24 hours per day locked alone in a cell consisting of 75 square feet of living space.  The cell has thick concrete walls and a solid steel door that prevents Mr. Savage from viewing the interiors of other cells or having direct contact with other incarcerated persons or passing staff.

24.     Mr. Savage's cell contains a single window slit to the outside, through which his only view is a cement yard.  He receives meals through a slot in the door and consumes meals alone inside the cell.  Mr. Savage is never in the physical presence of a guard or other prison staff without full restraints, including handcuffs and leg irons.  His limited "recreation" time occurs either in a small indoor room or an outdoor cage, known as a "dog run" because it resembles an animal kennel.  The cage is surrounded by tall concrete walls and covered on top with thick fencing

that obscures any view of the outside.  There, Mr. Savage can converse for short periods with a handful of incarcerated persons subject to SAMs, each in a separate cage.

25.    It is in the context of these conditions of confinement that Defendants, through the SAMs, severely limit Mr. Savage's ability to communicate with anyone *outside* prison. Under the SAMs, Defendants restrict Mr. Savage's approved contact list to a fixed group of seven social contacts: his older sister, Conchetta Savage; her two adult children (Mr. Savage's niece and nephew), Yulise and Yusuf; Mr. Savage's three adult children, Kaiion, Kemoni, and Siani; and Siani's mother, Crystal Copeland.[3]  That group has not changed since 2014, when Defendants added Mr. Savage's niece and nephew to the list after his mother died.

26.    Mr. Savage has repeatedly requested that Defendants expand his approved contacts under his SAMs so he can resume relationships with other adult relatives and long-time friends, including the mothers of his children, Kaiion and Kemoni, and establish relationships with grandchildren or in-laws who have joined his extended family, particularly Kaiion's wife, Tiana Smalls, and their two young children, Kayaam and Kyda Savage, Mr. Savage's grandchildren. Mr. Savage has also sought to add Sekei Douglas, the minor son of Mr. Savage's sister, Kidada Savage, to this SAMs.  Defendants have consistently denied those requests.  Because the SAMs prohibit Mr. Savage's approved contacts from forwarding mail or sharing information between Mr. Savage and others, Mr. Savage and his relatives and friends have had no contact, and thus no relationship, for 14 years, ever since Defendants first imposed the SAMs.

27.    Under the SAMs, Mr. Savage cannot have nonlegal telephone calls with anyone other than the seven individuals listed in the SAMs.  These phone calls are limited in H-Unit to

---

[3]    Mr. Savage's younger sister, Kidada Savage, who was a co-defendant in Mr. Savage's capital case, is not an approved contact under the SAMs.  This complaint does not seek to have her added as a contact under Mr. Savage's SAMs.

two-to-four per month, must be prearranged, last just 15 minutes each, and must be live monitored by either a BOP Special Investigative Officer at ADX Florence or an FBI agent. Due to these restrictions, Mr. Savage's scheduled calls are often delayed or canceled due to the unavailability of a BOP officer or FBI agent to conduct phone monitoring. The SAMs restrict Mr. Savage's phone privileges to such an extent that individuals who are not listed in the SAMs cannot even be present when Mr. Savage is speaking with a SAMs-approved contact. As a result, relatives of Mr. Savage whom Defendants have refused to add to his list, including young children, must leave the room when an approved family member is speaking with Mr. Savage.

28.     Under the SAMs, Mr. Savage is also prohibited from having visits with anyone other than the seven individuals on his SAMs list. These visits must be prearranged with 14 days' advance written notice and are live monitored and recorded by an FBI agent and/or BOP officer. Due to the remote location of ADX Florence (several hours from the Denver airport and hundreds of miles away from his approved contacts) and the cost of long-distance travel, Mr. Savage has received only a handful of visits from his approved contacts in the past decade.

29.     Further, the SAMs severely limit Mr. Savage's mail correspondence. He cannot exchange nonlegal mail with anyone other than the seven individuals on his SAMs list, and that correspondence is limited to three pieces of paper, double-sided, once per calendar week, to a single recipient.[4] Mr. Savage's nonlegal mail is routed through an FBI agent in Philadelphia, who prescreens it prior to that mail being forwarded to the approved contact or Mr. Savage.

---

[4]     The SAMs also allow Mr. Savage to write to federal judges and prosecutors, members of Congress, the BOP, and federal law enforcement officials. The SAMs were modified in 2020 to allow Mr. Savage to take a correspondence course with a local college, though the correspondence course been put on hold by the COVID-19 pandemic. And, as noted, Mr. Savage was recently informed his SAMs are being modified to allow him to communicate with an Imam.

30.     If not for the SAMs restrictions, Mr. Savage would be incarcerated on federal death row at the USP in Terre Haute, Indiana.  Federal death row prisoners are generally allowed 300 minutes of telephone time per month, can place calls directly throughout the day, and are permitted to speak with a broad range of contacts.  Moreover, per BOP policy, Mr. Savage would be able to receive visits from a broad range of individuals.

**B.     The Repeated Renewal of the SAMs Restrictions on Mr. Savage's Contacts**

31.     The 2015 version of the SAMs permitted Mr. Savage to have contact with Crystal Copeland, the mother of one of his children, his sister, his three children, and his nephew and niece, Yusuf and Yulise Savage.

32.     By letter dated October 5, 2015, counsel for Mr. Savage in his capital appeal requested that the SAMs be discontinued or modified to include additional friends and relatives, including Ms. Terkessa Bradsher and Ms. Teia Rannels (nee Jones) the mothers of Mr. Savage's other two children.

33.     On January 27, 2016, DOJ renewed the SAMs without adding any of the requested contacts and, beyond reciting events preceding Mr. Savage's conviction and sentence, provided no justification for its refusal to add them.

34.     By letter dated September 26, 2016, counsel for Mr. Savage again requested that the SAMs be discontinued or modified to include additional family members and friends, including Ms. Bradsher and Ms. Rannels.

35.     On January 18, 2017, DOJ again renewed the SAMs without adding any of the requested contacts and, beyond reciting events preceding Mr. Savage's conviction and sentence, provided no justification for its refusal to add them.

36.     By letter dated August 3, 2017, counsel for Mr. Savage again requested that the SAMs be discontinued or modified to include additional family members and friends, including Ms. Bradsher and Ms. Rannels.

37.     On January 29, 2018, DOJ again renewed the SAMs without adding any of the requested contacts and, beyond reciting events preceding Mr. Savage's conviction and sentence, provided no justification for its refusal to add them.

38.     By letter dated December 15, 2018, counsel for Mr. Savage requested that the SAMs be discontinued or modified to include additional family members and friends, including Ms. Bradsher, Ms. Rannels, Mr. Savage's new daughter-in-law, Tiana Smalls, longtime friends Mr. Laverne Bailey, Ms. Brenda White, and Mr. Levon Kelsey, and Mr. Savage's young nephew and his grandson Kayaam, who had recently been born.

39.     On January 17, 2019, DOJ again renewed the SAMs without adding any of the requested contacts and, beyond reciting events preceding Mr. Savage's conviction and sentence, provided no justification for its refusal to add them.

40.     By letter dated December 30, 2019, counsel for Mr. Savage again requested that the SAMs be discontinued or modified to include additional family members and friends, including the individuals listed in the December 15, 2018 letter.

41.     On January 23, 2020, DOJ again renewed the SAMs without adding any of the requested contacts and, beyond reciting events preceding Mr. Savage's conviction and sentence, provided no justification for its refusal to add them.

42.     By letter dated December 11, 2020, counsel for Mr. Savage requested that the SAMs be discontinued or modified to include additional family members and friends, including the individuals identified in the December 30, 2019 letter, as well as his new granddaughter, Kyda,

and Ms. Stephanie Keyes, the newlywed wife of Mr. Savage's nephew Yusuf, who is himself an approved contact.

43.    On January 28, 2021, DOJ again renewed the SAMs without adding any of the requested contacts and, beyond reciting events preceding Mr. Savage's conviction and sentence, provided no justification for its refusal to add them.

44.    Thus, for at least six years, Mr. Savage's requests to expand his contact lists have met with the same formulaic response.

45.    DOJ has repeatedly renewed Mr. Savage's SAMs *pro forma*, with no analysis of why his request to add individuals to his contact list should continue to be denied.  DOJ has not accounted for the passage of time or for Mr. Savage's behavior while in BOP custody.

46.    Defendants purport to continue to renew Mr. Savage's SAMs, including the limitations on his contacts, based primarily on events that are more than 16 years old, and all of which occurred at least eight years ago, before he was returned to ADX Florence.  Defendants have not cited any more recent behavior by Mr. Savage to justify the refusal to expand the SAMs-approved contacts.

47.    On information and belief, DOJ annually renews the SAMs without substantive modification based solely on the recommendation of the local United States Attorney and the FBI agent responsible for prosecuting and convicting Mr. Savage.

48.    On information and belief, other individuals incarcerated at ADX Florence who are subject to SAMs—including those convicted of terrorism offenses—have many more approved contacts than Mr. Savage.

### C.    Mr. Savage's Requested SAMs Contacts

49.    As shown on the list he provided to Defendants, the individuals that Mr. Savage has requested to be added to his SAMs-approved contacts include close family and friends who

have no connection to the activities of which Mr. Savage was convicted.  These individuals are as follows:

50.     Ms. Terkessa Bradsher is the mother of Mr. Savage's daughter, Kemoni. Ms. Bradsher works as a family-services supervisor, managing a department of people in a facility that cares for adults with intellectual disabilities, a position that she has held for three years. Ms. Bradsher has known Mr. Savage for 31 years and gave birth to their daughter in September 1996.  Ms. Bradsher, in addition to raising Mr. Savage's daughter, was a caretaker of Mr. Savage's mother prior to her death.  She has no criminal record.

51.     Ms. Teia Rannels, née Jones, is the mother of Mr. Savage's son, Kaiion. Ms. Rannels is a nurse who has worked for the Inglis Nursing Facility for two years.  Mr. Savage's and Ms. Rannels' son, Kaiion, has two children, who are Ms. Rannels' and Mr. Savage's grandchildren.  Ms. Rannels helped pay for Mr. Savage's son, Kaiion, to visit him at ADX Florence.  She has no criminal record.  She would like to be able to communicate with Mr. Savage to discuss their son Kaiion and their grandchildren.

52.     Ms. Tiana Smalls is the wife of Mr. Savage's son, Kaiion.  They were married several years ago while Mr. Savage was at ADX, but she has never been allowed the opportunity to speak or exchange a letter with her father-in-law, Mr. Savage.  Ms. Smalls is the assistant director of a daycare with the Your Child and Mine Early Learning Center, her employer of four years.  Ms. Smalls and Kaiion Savage have two children, Mr. Savage's grandchildren.  She has no criminal record.  She would like to get to know Mr. Savage, to share in her husband Kaiion's communications with him, and to speak with him about his grandchildren.

53.     Kayaam Savage and Kyda Savage are the children of Mr. Savage's son Kaiion and Ms. Tiana Smalls.  Kayaam and Kyda are minors without a criminal record.  They would like to have the ability to speak with Mr. Savage, their grandfather, to get to know him.

54.     Sekei Douglas is the son of Kidada Savage, Mr. Savage's sister.  Sekei is a minor with no criminal record.  Sekei would like to have the ability to speak with Mr. Savage in order to get to know his uncle.

55.     Ms. Stephanie Keyes in the wife of Mr. Savage's nephew, Yusuf Savage.  They were married last year.  Ms. Keyes is an operations specialist at Image Studios and holds a BBA from Penn State, as well as an MBA from Jefferson University.  She has no criminal record.  She would like to be able to share in her husband's communications with Mr. Savage and to get to know Mr. Savage, who was like a surrogate father to her husband when he was growing up and is someone to whom her husband remains very close.

56.     Mr. Levon Kelsey is a life-long friend of Mr. Savage and is the godfather to Mr. Savage's nephew, Yusuf Savage.  Mr. Kelsey lives in the Denver, Colorado area and works as a telecommunications engineer for Charter Communications.  Mr. Kelsey was in close contact with Mr. Savage prior to his conviction.   Mr. Kelsey has no criminal record other than an approximately 25-year old conviction for misdemeanor theft of services.  He would like to be able to communicate with Mr. Savage to renew their friendship.

57.     Ms. Brenda White is a childhood neighbor and lifelong friend of Mr. Savage. Ms. White is a retiree, having worked for 28 years for the Internal Revenue Service.  She has no criminal record.  She would like to be able to communicate with Mr. Savage to renew their friendship.

58.     As detailed above, each of these contacts is either a family member or close friend of Mr. Savage.  All the requested contacts are gainfully employed or were employed prior to their retirement or are children.  All but one of the requested contacts have no criminal history, and the one requested contract with a criminal history was convicted of one nonviolent misdemeanor nearly 25 years ago and does not have connections to the crimes of which Mr. Savage was convicted.

59.     Defendants have provided no explanation for their denial of Mr. Savage's requests to modify his SAMs to include the individuals described above.  Given that these individuals are family or close friends without histories of felony criminality or violence, there is no reason for Defendants to prevent Mr. Savage from communicating with them.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Violation of the APA – Arbitrary, Capricious, Contrary-to-Law**
**Imposition and Renewal of SAMs**
**(against Defendants DOJ and Garland)**

60.     Mr. Savage incorporates by reference the foregoing paragraphs of this complaint as if set forth fully herein.

61.     According to 28 C.F.R. § 501.3(a) and (c), SAMs may be imposed or continued on a person in the custody of the BOP only when "there is substantial risk that the person's communications or contacts with persons could result in serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  The restrictions also must be "reasonably necessary to protect persons against the risk of death or serious bodily injury."  28 C.F.R. § 501.3(a).

62.     For years, Mr. Savage's SAMs have stated formulaically that the restrictions, including the contacts limitations, are "reasonably necessary to prevent the inmate from

16

committing, soliciting, or conspiring to commit additional criminal activity," and "are the least restrictive that can be tolerated in light of the ability of this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury to persons."

63.     Defendants' repeated, formulaic denial of Mr. Savage's requested additional contacts to his SAMs violates the standards set forth in the SAMs, the SAMs regulations, and the renewal of the SAMs.

64.     The individuals Mr. Savage has requested to add to his approved SAMs contacts are family members or close friends who are gainfully employed or are minor children, and they do not have any history of violent criminality.  Defendants have not articulated, much less demonstrated, a "substantial risk" that Mr. Savage's communications with the individuals named in his list of requested approved contacts "could result in serious bodily injury" to anyone.  Nor can Defendants demonstrate that the SAMs, as currently comprised, are "reasonably necessary" or "the least restrictive measure that can be tolerated" to prevent a risk of death or serious bodily injury.

65.     The APA prohibits decisions by federal administrative agencies, including Defendants, that are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law.  5 U.S.C. § 706(a)(2)(A) & (D).

66.     By repeatedly and formulaically refusing to expand Mr. Savage's severely restricted contact list under his SAMs without considering whether such a restricted list is reasonably necessary to protect persons against the risk of death or serious bodily injury, Defendants have acted and are acting in violation of their own regulations and are thus acting

arbitrarily, capriciously, and not in accordance with law, and are abusing their discretion, in violation of the APA.

67.     By repeatedly and formulaically refusing to expand Mr. Savage's severely restricted contact list under his SAMs without considering whether such a restricted list is reasonably necessary to protect persons against the risk of death or serious bodily injury, Defendants are acting without observance of procedure required by law, in violation of the APA.

68.     As a result of Defendants' unlawful conduct, Mr. Savage has suffered and will continue to suffer harm because he has been deprived of contact with family and close friends.

69.     Because of Defendants' unlawful conduct, Mr. Savage is entitled to declaratory and injunctive relief.

**COUNT TWO**
**Violation of the First Amendment – Denial of Right to Free Speech**
**(against all Defendants)**

70.     Mr. Savage incorporates by reference the foregoing paragraphs of this complaint as if set forth fully herein.

71.     By imposing and renewing the SAMs against Mr. Savage without expanding his list of approved contacts, Defendants have prohibited and are continuing to prohibit Mr. Savage from engaging in communications with a wide array of people, including close family members and friends, including nieces, nephews, grandchildren, and the mothers of his children.

72.     Because of their repeated, summary rejection of Mr. Savage's requests to expand his list of approved contacts, Defendants are censoring and restricting Mr. Savage's communications to a degree greater than necessary to preserve prison security and public safety or protect against the risk of acts of violence or terrorism.

73. Incarcerated persons enjoy a right to free speech protected by the First Amendment. A regulation may not impinge on an incarcerated person's right to free speech unless that regulation is reasonably related to legitimate penological interests.

74. The extreme, unnecessary restriction Defendants continue to impose on Mr. Savage's communications through their repeated, summary rejection of Mr. Savage's requests to expand his list of approved contacts violates Mr. Savage's First Amendment right to free speech.

75. Defendants' continued infringement of Mr. Savage's First Amendment right to free speech is not reasonably related to any penological interest.

76. As a result of Defendants' unlawful conduct, Mr. Savage has suffered and will continue to suffer harm because he has been deprived of contact with family and close friends.

77. Because of Defendants' unlawful conduct, Mr. Savage is entitled to declaratory and injunctive relief.

**COUNT THREE**
**Violation of the First Amendment – Denial of Right to Free Association**
**(against all Defendants)**

78. Mr. Savage incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

79. By imposing and renewing the SAMs against Mr. Savage without expanding his list of approved contacts, Defendants have prohibited and are continuing to prohibit Mr. Savage from engaging in communications with a wide array of people, including close family members and friends, including nieces, nephews, grandchildren, and the mothers of his children.

80. Because of their repeated, summary rejection of Mr. Savage's requests to expand his list of approved contacts, Defendants are censoring and restricting Mr. Savage's communications to a degree greater than necessary to preserve prison security and public safety or protect against the risk of acts of violence or terrorism.

81.     Incarcerated persons enjoy a right to free association protected by the First Amendment. A regulation may not impinge upon an incarcerated person's right to free association unless that regulation is reasonably related to legitimate penological interests.

82.     The extreme restrictions Defendants continue to impose on Mr. Savage's communications, including their repeated, summary rejection of Mr. Savage's request to expand his list of approved contacts, violate Mr. Savage's First Amendment right to free association.

83.     Defendants' continued infringement of Mr. Savage's First Amendment right to free association is not reasonably related to any penological interest.

84.     As a result of Defendants' unlawful conduct, Mr. Savage has suffered and will continue to suffer harm because he has been deprived of contact with family and close friends.

85.     Because of Defendants' unlawful conduct, Mr. Savage is entitled to declaratory and injunctive relief.

**COUNT FOUR**
**Violation of the First Amendment – Deprivation of the Right to Familial Association**
**(against all Defendants)**

86.     Mr. Savage incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

87.     By imposing and renewing the SAMs against Mr. Savage without expanding his list of approved contacts, Defendants have prohibited and are continuing to prohibit Mr. Savage from engaging in communications with a wide array of people, including close family members and friends, including nieces, nephews, grandchildren, and the mothers of his children.

88.     Because of their repeated, summary rejection of Mr. Savage's requests to expand his list of approved contacts, Defendants are censoring and restricting Mr. Savage's communications to a degree greater than necessary to preserve prison security and public safety or protect against the risk of acts of violence or terrorism.

89.    Incarcerated persons enjoy a right to associate with family members protected by the First Amendment. A regulation may not impinge on that right unless it is reasonably related to legitimate penological interests.

90.    Mr. Savage's First Amendment right of familial association extends to the individuals he has repeatedly asked to be added to his contact list, which include his grandchildren and the mothers of his children.

91.    The extreme restrictions Defendants continue to impose on Mr. Savage's communications, including their repeated, summary rejection of Mr. Savage's request to expand his list of approved contacts to include additional family members, violate Mr. Savage's First Amendment right to familial association.

92.    Defendants' continued infringement of Mr. Savage's First Amendment right to familial association is not reasonably related to any penological interest.

93.    As a result of Defendants' unlawful conduct, Mr. Savage has suffered and will continue to suffer harm because he has been deprived of contact with family and close friends.

94.    Because of Defendants' unlawful conduct, Mr. Savage is entitled to declaratory and injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Savage respectfully requests that this Court enter judgment in his favor and against Defendants and grant him the following relief:

1.    A declaration that Defendants have violated the APA by acting arbitrarily, capriciously, not in accordance with law, and without observance of procedure required by law.

2.    A declaration that Defendants have violated Mr. Savage's right to free speech, guaranteed by the First Amendment of the United States Constitution.

3.      A declaration that Defendants have violated Mr. Savage's right to free association, guaranteed by the First Amendment of the United States Constitution.

4.      A declaration that Defendants have violated Mr. Savage's right to familial association, guaranteed by the First Amendment of the United States Constitution.

5.      A permanent injunction ordering Defendants to (a) allow Mr. Savage contact with the individuals identified in Section C of this Complaint and (b) prohibit Defendants and their successors from removing any of those individuals from Mr. Savage's list of approved contacts as long as Mr. Savage remains under SAMs, unless it is established that communication with such individual presents a serious risk of death or bodily injury to another person; or in the alternative, a permanent injunction ordering Defendants to faithfully comply with 28 C.F.R. § 501.3 and its implementing procedures as to the SAMs imposed on Mr. Savage by, *inter alia*, requiring Defendants to revisit Mr. Savage's request to expand his SAMs contact list and evaluate any future requests by Mr. Savage for additional individuals be added to his contact list using the proper legal standard.

6.      Attorneys' fees and costs.

7.      Any further relief that the Court deems just and proper.

Dated April 15, 2021

Respectfully submitted,

*/s/ Seth A. Rosenthal*
SETH A. ROSENTHAL (D.C. Bar No. 482586)
JOSEPH R. HICKS (D.C. Bar No. 1003680)
CHRISTOPHER N. MORAN (D.C. Bar No. MD0130)

VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Telephone: (202) 344-4741

Facsimile: (202) 344-8300
Email: SARosenthal@Venable.com
JRHicks@Venable.com
CNMoran@Venable.com

*Attorneys for Plaintiff Kaboni Savage*